Filed 8/25/16  P. v. Jacques CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B266138 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA087359) |
| v. | |
| MICHAEL JACQUES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mildred Escobedo, Judge.  Affirmed as modified.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Roberta L. Davis and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Michael Jacques appeals from his conviction, after jury trial, of multiple counts of residential burglary (Pen. Code, § 459) and receiving stolen property (Pen. Code, § 496, subd. (a)), and a single count of carjacking (Pen. Code, § 215, subd. (a)). We reject all of defendant's challenges to his conviction, although we modify his sentence in several respects.

## FACTUAL AND PROCEDURAL BACKGROUND

The bulk of defendant's offenses arise from a burglary spree in which defendant burglarized multiple residences in February and March 2013. He committed the crimes using a black Chevy Impala which his girlfriend, Crystal Davis, had rented from Hertz, a rental car corporation, on February 14, 2013, and failed to return when the rental period was over. Property from the burglaries was subsequently discovered in the Impala and in a storage locker defendant had rented on March 26, 2013.

The actual facts of the offenses are only relevant in the context of defendant's claims of instructional error. We therefore discuss them briefly, and do so in chronological order.

1. *Burglary of Dania Rubio – Count 1, Burglary with Person Present*

On February 19, 2013, at 2:00 p.m., Rubio returned to her home, with her mother and her toddler, to discover a burglary in progress. Defendant had entered by breaking a window in the toddler's bedroom. When Rubio arrived home, the Impala was parked in her driveway. After Rubio entered the house, her mother saw defendant jump over the fence and out of the yard, get in the Impala, and drive away. When Rubio reported the crime to police, she gave them the correct license plate number from the Impala. Rubio's expired driver's license, which had been stolen from her toddler's bedroom, was ultimately recovered from defendant's storage locker.

2. *Burglary of Chantal Williams – Count 21, Burglary and Count 13, Receiving Stolen Property*

On March 2, 2013, at 11:30 p.m., Chantal Williams returned home to see defendant leaving her house, carrying one of her television sets out the front door. He had gained entry by breaking the security lock on her back door. When defendant saw

2

Williams, he jumped into his car and drove off. Williams tried to follow and read the license plate number, but she could only get one digit. A receipt with Williams's name on it, which had been taken from her house, was eventually recovered from the Impala. A gift card given to her by a student, with the student's name on it, was also recovered from the Impala.

3.    *Burglary of Collin Nielsen – Count 3, Burglary*

On March 9, 2013, at 11:00 a.m., Collin Nielsen returned home to discover a burglary in progress. The Impala was parked in his carport. Nielsen saw defendant exit the house and enter the Impala. Nielsen moved his own car, to leave defendant room, and defendant drove the Impala past Nielsen, where he was able to see defendant. Defendant had gained entry to the house by ripping and removing a window screen, and going through the window. Nielsen reported the crime to police, and accurately gave them the license plate number from the Impala. Nielsen identified defendant in court at the preliminary hearing and at trial. None of the electronics stolen from Nielsen's home was recovered.

4.    *Burglary of Jonathan Bruce – Count 7, Burglary*

On March 12, 2013, defendant burglarized Jonathan Bruce's apartment while Bruce was at work. Defendant pulled a couch under a high window on the side of the building, and broke the window. Before doing so, defendant knocked on one of Bruce's neighbor's doors. When the neighbor answered, defendant asked if "Eric" lived there; there had never been an Eric there. The neighbor identified defendant from a photographic lineup, although she was not positive. Items stolen from Bruce's apartment were recovered from both the Impala and defendant's storage locker.

5.    *Burglary of Reynato Lucas – Count 8, Burglary with Person Present*

After 7:00 a.m. on March 25, 2013, Reynato Lucas returned to his house after going for a morning run. He was cooling down alone in his room, although two other residents were also in the house. After approximately 30 minutes, he heard a loud noise. He went to another room to investigate and discovered defendant inside his home, looking out the window. Defendant had gained entry by removing a window screen and

3

opening a window.  Lucas said, "What the fuck are you doing?" and went back to his bedroom to get his phone.  Defendant said, "Oh shit" and fled.  Lucas chased defendant while simultaneously calling 911 on his cell phone.  He saw the Impala drive off, and correctly gave the 911 dispatcher the Impala's license plate number.[1]  Lucas interrupted the burglary before defendant could take anything.

6.    *Burglary of Thelonia Brown/Carjack of Sylvia Fairmon – Count 10, Burglary and Count 11, Carjacking*

On March 25, 2013, a few hours after the Lucas burglary, defendant burglarized the residence of Sylvia Fairmon's daughter, where Fairmon's mother, Thelonia Brown, had been staying.  After 11:00 a.m., Fairmon drove her mother to the house.  Fairmon's daughter lived in a triplex; the triplex had a narrow driveway in the back, which widened out to a carport with space for multiple cars.  When Fairmon drove past her daughter's door, she saw that it had been pried open.  She drove her van to the end of the driveway, where she saw defendant, who was carrying two bags, get in the black Impala in which a woman was already sitting.  Fairmon stopped her van at the end of the driveway, right before it widens, blocking defendant's ability to leave.  Fairmon and her mother exited the van; Fairmon told defendant she was calling the police.

Defendant ran up to Fairmon; Fairmon told her mother to run into the house.  Defendant pinned Fairmon against the wall, put a gun to her head and said, "Bitch give me the keys or I will . . . fucking kill you."  Fairmon gave him the keys.  Defendant got into Fairmon's van and drove it a short distance, crashing it into two other cars at the back of the carport.  He then re-entered the Impala and drove away.

---

[1]    The Impala's license plate number was 6YMU412.  The 911 transcript indicates Lucas gave the number as "Yankee [unintelligible] Uniform 412."  When the recording of the 911 tape was played at trial, counsel asked Lucas if he heard himself give the number as "6JE Mike Uniform 412."  It appears that the reporter's transcript erroneously states "JE" for "Yankee," which the 911 transcript properly indicated.  Indeed, it is clear that Lucas correctly identified the license plate number of the Impala, because the police ultimately identified the car as owned by Hertz and rented to Davis based on Lucas's report.

4

None of the items stolen from the home of Fairmon's daughter was ever recovered. However, Fairmon described defendant's distinctive tattoo to police, and identified him from a photographic lineup, and at trial.

7. *Burglary of Jacqueline Griffin, Jessica Griffin, and Walter Beatty – Count 18, Burglary; Count 16, Receiving Stolen Property; Count 19, Burglary; and Count 20, Burglary*

Jacqueline Griffin lives next door to her cousin, Walter Beatty. Jacqueline's daughter Jessica lives behind Beatty. Defendant burglarized all three of their homes, a few hours after the Fairmon carjacking, on March 25, 2013. Each of the three homes was broken into and ransacked; items were missing from all three. At 2:45 p.m., when Jacqueline Griffin came home and discovered the burglary at her house, she saw the Impala in Beatty's driveway with the trunk open. She called police and saw the vehicle leave.

A W-2 form stolen from Jessica Griffin's house was recovered from the Impala. A coin purse stolen from Jacqueline Griffin's house was also found in the car.

8. *Defendant's Arrest and the Investigation*

Defendant was arrested on March 30, 2013, but not for any of these crimes. He had been the passenger in a Mazda driven by his girlfriend, Davis, which was parked in a fire lane. Defendant had accidentally shot himself in the leg, with a gun he had in the car. When police arrived, he was standing outside the car, putting bags in the trunk. Los Angeles Police Department (LAPD) patrol officers from the Newton station investigated the stopped vehicle, and arrested defendant for being a felon in possession of a firearm. The girlfriend was released. Defendant was ultimately convicted of being a felon in possession of a firearm, and transportation of marijuana.

On April 1, 2013, Davis brought the Impala to the Newton station, and opened the trunk for officers to look inside. There, police saw the rental records for the storage unit defendant had rented on March 26.

What the LAPD officers had not known was that Gardena Police officers had been looking for the Impala ever since victim Lucas called in its license plate number. The

Gardena officers obtained a warrant to access the car's location via the OnStar system. Using OnStar's data, they located the Impala in front of defendant's residence. At that time, they planted their own tracking device on the car. On March 27, 2013, they located the Impala at a casino, and conducted surveillance on it. Officers saw defendant go back and forth from the casino to the driver's seat of the car. A woman, who was not Davis, was with him at this time.

On either April 1 or April 2, Gardena officers checked the tracker to determine the Impala's location and discovered it was at LAPD's Newton division. Gardena officers requested LAPD officers to hold the car for them, and it was at this point that LAPD learned that the car had been involved in multiple burglaries. Police then searched the Impala and the storage unit, finding a great deal of stolen property.

On April 3, 2013, defendant made a telephone call to Davis while in custody; the call was recorded. During the call defendant asked Davis to get his "stuff out of the car" which "ain't just some ordinary stuff." If that was not possible, he said, he wanted Davis to ask his mother to get his stuff, because "she done it before. She had that situation with her. Like, she didn't—been involved in that situation with herself, so she knows exactly what to do." Additionally, he asked Davis if she had gone inside the storage unit yet. When Davis asked what was in there, defendant replied, "I already told you." When she said she did not remember, defendant started to "get a funny vibe" that "the feds" were "working all around" him. He was frustrated that Davis "want[ed] [him] to itemize, instead of [her] going to go look." Finally, defendant told her he needed her to "go get that stuff, so [he could] make a better decision." When Davis said it had nothing to do with his decision, defendant responded, "It does, cause that compromises me."

9. *Stolen Property from Other Burglaries – Counts 12, 14 and 15, Receiving Stolen Property*

When police searched the Impala and the storage locker, they found stolen goods from three other burglaries. Only the receiving stolen property count relating to victim Haseok Lim is at issue on appeal. The issue is the value of the property.

6

Lim's home had been burglarized in December 2012, and a great deal of property had been taken, including electronics and jewelry. In April 2013, he was contacted by Gardena police officers, who had recovered some of Lim's property from defendant's storage locker. He identified his stolen property by serial number. The recovered property included a 37-inch Samsung LCD, 47-inch LG3 DVD,[2] a 24-inch LG monitor, a 3D 24-inch Playstation 3 monitor, Playstation 36 (120 GB); and a Nintendo Wii U and the controller. When asked the value of the recovered items, Lim testified it was "more than like $2,500." He did learn, however, that the screens on two of the TVs were cracked; he took them to the recycling center.

10.    *Self-Representation, Charges, and Discovery*

Prior to his preliminary hearing, defendant waived his right to counsel and represented himself. Subsequent to his preliminary hearing he was charged with the above-identified counts.[3] As to the carjacking of Fairmon, it was further alleged that defendant personally used a firearm within the meaning of Penal Code section 12022.53, subdivision (b). Three prior prison terms were also alleged, within the meaning of Penal Code section 667.5, subdivision (b).

Defendant continued to represent himself as the case proceeded to trial. He filed numerous motions and discovery requests. Relevant for our purposes are defendant's attempts to obtain discovery. Defendant filed multiple informal requests for discovery and, on the eve of trial, a motion to compel the discovery he believed he had not yet received. He sought to compel a long list of discovery items; three are at issue here: (1) GPS tracking data obtained on the Impala by the police from OnStar; (2) GPS tracking data obtained on the Impala by the police with their own tracking device; and (3) phone records, including location of, and text messages to and from, Davis's cell

---

[2]    This is somewhat ambiguous. A DVD or DVD player is not measured at 47-inches. A photograph of Lim with the recovered property shows that this is a television.

[3]    There was an additional count of burglary which was dismissed when the victim did not appear to testify at trial.

7

phone, purportedly obtained by the police from Davis's carrier. All of this information was intended to support defendant's theory that Davis had set him up by bringing the Impala to the police with the storage locker documentation in the trunk. Defendant wanted to establish that, after defendant's arrest, the Impala had been driven to the home of the *real* burglar, who was in cahoots with Davis and had then transferred the loot to the storage facility.

At a hearing on defendant's motion to compel, the prosecutor represented that there was no additional OnStar or tracking information, but the prosecution would confirm with the officers.[4] The court directed the prosecution to give defendant the OnStar records.[5] The prosecution was directed to turn over the police tracking data, if it existed. As to the cell phone data, the prosecutor agreed that the police had obtained a warrant to obtain Davis's cell phone data, but represented that they never executed the warrant. The court directed the prosecutor to confirm this with the officers. Another hearing was scheduled which would resolve these outstanding issues.

However, before that hearing could be held, defendant's self-represented status was revoked for misconduct. The public defender was appointed to represent defendant; ultimately, that office declared a conflict and the alternate public defender was appointed. The alternate public defender also had a conflict, and defendant was appointed counsel from the bar panel. The case was also transferred to several different courtrooms. The hearing to follow up on defendant's in discovery motion was never held. However, the record indicates that, during this time, the prosecutor continued to informally provide discovery to defense counsel.

---

[4] It appears that defendant assumes that OnStar and the police GPS tracking device were always collecting data; that is, that they generated a list of all locations the vehicle visited, which could then be downloaded and provided to defendant. The prosecution's argument implied that data from OnStar and the police tracker only existed during the times when those devices were specifically queried regarding the vehicle's location.

[5] There had been a subpoena duces tecum to Hertz; at a previous hearing, the court directed the clerk to give the Hertz data to both parties. It is not clear if the Hertz data and the OnStar data were the same thing.

8

11. *Trial and Verdict*

The case proceeded to jury trial. Defendant testified in his defense, taking the position that he committed none of the charged offenses. He admitted renting the storage unit, but represented that he had rented it for Davis, who wanted the unit, but had been unable to rent it herself, because she did not have her identification with her. He stated the only thing he put in the storage unit was marijuana. He denied ever driving, or even being in, the Impala.

The jury found defendant guilty as charged. Defendant admitted the three prior prison terms.

12. *Posttrial Marsden Motion*

At the sentencing hearing, defendant requested to be heard on a motion under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), to appoint new counsel on the basis that his current counsel was providing ineffective assistance. The court heard the motion, giving the defendant an opportunity to set forth counsel's perceived deficiencies in the absence of the prosecutor. Defendant itemized a litany of over 15 faults, ranging from a (nonspecific) failure to object to objectionable evidence to a failure to assist with defendant's demeanor while testifying. Among these issues were a failure to obtain the cell phone records and GPS tracking data on the Impala.

When asked for his response, defense counsel did not know where to begin, as defendant had raised so many issues. The court walked counsel through defendant's concerns, and he addressed each one individually, explaining his tactical reasons behind many challenged decisions. As to the alleged failure to obtain Davis's cell phone records, which the police had (according to defendant) obtained via warrant, counsel replied, "I am not aware of that." As to the tracking device, he stated, "I don't know if any information was obtained from a tracking device."[6]

---

[6] Counsel also stated, "[I]t was my recollection that the car was impounded before they had a chance to put the device on." This was mistaken; the officers clearly testified that they placed the device on the Impala at defendant's residence and used the tracking data to locate it at the casino.

After hearing all of counsel's responses, the court concluded defendant's motion was simply a case of disappointment with a verdict which was reached in the face of overwhelming evidence. The court acknowledged that defendant believed counsel did not have his best interest at heart – by not pursuing the arguments defendant would have pursued – but concluded that none of that had an effect on the case. The court denied the *Marsden* motion and proceeded to sentencing.

13.    *Sentencing*

Defendant had been convicted of one count of carjacking with a firearm enhancement, nine counts of burglary, and five counts of receiving stolen property. The court reduced four of the receiving offenses—all except for the count involving victim Lim—to misdemeanors, pursuant to Proposition 47. Sentences on the two that arose from burglaries of which defendant was also convicted were stayed pursuant to Penal Code section 654.

Defendant's sentence was calculated as follows:

- For carjacking, the high term of 9 years, plus 10 years for the firearm enhancement, for a total of 19 years;

- For each of the nine burglary counts, a consecutive sentence of 1 year, 4 months (one-third the midterm) for a total of 12 additional years;

- For the Lim receiving stolen property count, a consecutive term of 8 months (one-third the midterm);

- For the two misdemeanor receiving stolen property counts, a consecutive year in jail, for a total of two more years (to be served in any institution); and

- For the three prior prison terms, an additional year each, for a total of three years. Defendant's total sentence was 36 years, 8 months.

The court awarded defendant 1716 days of presentence credit, consisting of 858 actual days and 858 conduct credits.

The court also ordered defendant to stay away from victim Fairmon and the location of the offenses, stating as its only rationale, "I don't know—I am going to

10

include this, that defendant shall be required to stay away from Ms. Fairmon." The prosecutor agreed.

Defendant filed a timely notice of appeal. On appeal, defendant raises five challenges: (1) instructional error on burglary; (2) failure to reduce the Lim receiving stolen property offense to a misdemeanor; (3) abuse of discretion in denying the *Marsden* motion; (4) improper sentencing on three prior prison terms, when he had actually served only two; and (5) no authority for the stay-away order. We have asked the parties to also discuss apparent errors in the abstract of judgment and the calculation of defendant's presentence credits.

**DISCUSSION**

1. *Instructional Error*

Residential burglary consists of the entry into any home with the intent to commit theft therein. (Pen. Code, § 459.) CALCRIM No. 1700 is a form jury instruction defining the elements of burglary as: (1) entry; and (2) the intent to commit theft. CALCRIM No. 1700 indicates that there will be a separate instruction defining theft given. CALCRIM No. 1800 is the form jury instruction defining the elements of theft as: (1) taking possession of property owned by another; (2) without consent; (3) with the intent to permanently deprive; and (4) that the property was moved a distance and kept for some time.

In this case, the court instructed the jury in the language of both CALCRIM No. 1700 and CALCRIM No. 1800. However, the court erroneously stated that *both* instructions set forth the elements of burglary, rather than stating that CALCRIM No. 1700 set forth the elements of burglary and CALCRIM No. 1800 set forth the elements of the target offense, theft. This mistake was in both the written and oral instructions, and went unnoticed at trial. Defendant contends that there is no way of knowing which definition of burglary the jury actually used, and argues that it is reasonably likely that at least one juror voted to convict defendant of burglary based on a finding that defendant had committed theft only.

11

While it is apparent that the court erred, it is also apparent that any error was harmless under even the strictest standard of review.  When the court fails to instruct on an element of the offense, we must reverse unless, after a thorough examination of the entire record, we cannot conclude beyond a reasonable doubt that the verdict would have been the same absent the error.  (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1166.)  Three factors lead us to the conclusion the error was harmless beyond a reasonable doubt in this case.

First, there was no dispute at trial that the victims suffered burglaries as opposed to mere thefts.  Defendant did not suggest that he had been, for example, invited to his victims' homes and taken their items once inside as a guest.  The homes were all broken into.  In other words, if defendant committed theft from these victims, he also committed burglary.  Defendant argues that, under the court's mistaken version of CALCRIM No. 1800, the jury could have convicted him of burglary based only on its finding that defendant had possession of the stolen goods.  But the court did not mistakenly instruct that burglary could be satisfied by the elements of receiving stolen property; it instructed that burglary could be satisfied by the elements of theft—which required taking possession of the property owned by another and moving it, an act necessarily committed in this case by the burglar.

Second, the prosecutor's opening argument to the jury clearly stated that the elements of burglary are entry and intent to commit theft.  Defendant argues that this was undermined by the prosecutor's statement in closing argument that we know defendant committed the burglaries "because property from every single one of these victims was found inside the car."  Defendant takes the prosecutor's statement out of context.  Defense counsel had argued that defendant had not committed any of the offenses.  The prosecutor responded that, in addition to the direct evidence of identification, there was also a great deal of circumstantial evidence - including that the stolen property was found in the car and storage locker.  The statement that we know defendant committed the offenses because he had the stolen property was simply an argument that his possession

12

of the stolen property established his identity as the perpetrator, not that his possession of stolen property was sufficient to establish the elements of burglary.

Third, the jury convicted defendant of the Lucas burglary. Lucas had interrupted defendant before he could take anything. Thus, there was no theft, only entry with an intent to commit theft. That the jury convicted defendant of the Lucas burglary establishes beyond doubt that the jury understood entry with intent to commit theft constituted burglary, and did not believe that burglary was defined by the elements of theft.

2.    *Failure to Reduce the Lim Receiving Stolen Property to a Misdemeanor*

Proposition 47, which was effective prior to defendant's trial, modified Penal Code section 496 to provide that receiving stolen property is a misdemeanor if the value of the property does not exceed $950. The jury was not asked to determine whether the value of the property taken in any the receiving stolen property offenses exceeded $950, and the court reduced all but one of them (the Lim offense) to misdemeanors at sentencing.

Assuming that the court erred in failing to present to the jury the element of value, any error is again harmless beyond a reasonable doubt. The sole evidence of value was the itemization of the stolen property found in defendant's storage locker, and Lim's statement that its value was "more than like $2,500." On appeal, defendant speculates that the jury might have thought the value of the two cracked televisions must be deducted from this amount, and that Lim might have been testifying to the value of all of the recovered items when new, rather than in their used condition. But defendant's speculation is just that; the only evidence is that the value of Lim's recovered items exceeded $2,500. The owner of property may give an opinion as to its value. (CALJIC No. 14.27.) There is simply no evidence to the contrary.

Defendant's inference that the value of the cracked televisions should be subtracted from Lim's estimate is based on his suggestion (made without legal authority) that the property must be valued at the time it was received by the defendant and his inference (made without factual support) that the televisions were broken when they

13

came into defendant's possession. Yet even if defendant were not the one who originally obtained the televisions from Lim's house, it is not reasonable to assume a burglar of his experience would have gone to the trouble of acquiring the televisions and moving them into his recently-leased storage facility if they were worthless at that time. The only reasonable inference is that the televisions were damaged after they came into defendant's possession.

3.      *Marsden Motion*

"Criminal defendants are entitled to the assistance of counsel in their defense. [Citations.] A court must appoint counsel to represent an indigent defendant. [Citation.] A defendant also has a right to seek substitute counsel under *Marsden* if the defendant can show that continued representation by present counsel would substantially impair or deny his or her right to effective assistance of counsel. [Citations.] The trial court must appoint new counsel when failure to do so would substantially impair the defendant's right to assistance of counsel. [Citation.] [¶] During a *Marsden* hearing, the court must allow the defendant an opportunity to explain the grounds for the motion and to relate specific instances of his or her attorney's inadequate performance. [Citation.] The trial court must afford the defendant every opportunity to express the specific reasons for dissatisfaction with counsel. [Citations.] Thus, a trial court abuses its discretion when it refuses to listen to the defendant's reasons for requesting substitute counsel. [Citations.] [¶] The right to effective assistance of counsel continues throughout proceedings in the trial court and on appeal. [Citations.] As here, it may arise after a verdict and before judgment is entered in the trial court. [Citations.] When new counsel is appointed at that stage of the proceedings, new counsel may, if counsel believes it is appropriate, move for a new trial on the grounds former counsel was ineffective. [Citations.]" (*People v. Knight* (2015) 239 Cal.App.4th 1, 5-6.)

Defendant argues the trial court abused its discretion in denying his *Marsden* motion given that counsel had no valid explanation for not obtaining Davis's cell phone records and the GPS tracking data on the Impala, despite defendant's diligent attempts to obtain discovery of this information when he had represented himself.

14

We see no abuse of discretion in the court's acceptance of counsel's explanation that he was unaware of such data.  When defendant had initially moved to compel disclosure of this information, the prosecutor represented that the police had never executed the search warrant on Davis's cell phone provider, and there was no further GPS tracking data to turn over.  While the prosecutor was directed to discuss this with the officers and to turn over any existing data, there is no indication that the prosecutor did not, in fact, confirm with the officers that no such data existed.  As such, defense counsel was rightly unaware of any such data and there is nothing in the record that suggests such information in fact existed.  Defendant's charge of ineffective assistance relies on the implicit assumption that the prosecutor consulted with the officers, found that the data existed, and, in complete derogation of the court's order, declined to turn it over to defense counsel.  That is an inference we are unwilling to make.

Moreover, we fail to see where defense counsel's choice to not continue to pursue defendant's strategy when he was self-represented constitutes ineffective assistance.[7]  Defendant sought the cell phone and GPS tracking data in the hopes of establishing that, while he was in jail, Davis drove the Impala to another location and then to the storage facility, prior to bringing the car to police.  Yet even if the data showed this, it would not raise a reasonable doubt in the face of Fairmon's unimpeachable identification of defendant, and defendant's jail phone calls to Davis, in which he begged her to get his "stuff" out of the car and the storage unit—indicating he was well aware of the incriminating evidence in both locations.

In his *Marsden* motion, defendant also complained of a sleeping juror and the fact that some jurors had accidentally seen him shackled and in jail attire; he believed counsel

---

**7**     Additionally, there is an element of untimeliness to defendant's assertion of a failure to pursue pretrial discovery in a post-trial *Marsden* motion.  The hearing on the motion to compel the defendant made while representing himself was held on August 12, 2014.  His self-representation status was revoked on August 20, 2014.  Trial counsel was appointed on September 11, 2014.  Jury selection began on June 22, 2015.  If defendant was concerned with the quality of counsel's pretrial preparation, he had some nine months in which to raise the issue with the trial court.

had rendered ineffective assistance by failing to object to these things. On appeal, he argues that the court erred in not asking defense counsel to explain his failure to object. But defendant's motion itself indicated that the deputy woke the sleeping juror, and counsel's decision to not call out the juror (assuming he was even aware the juror had been sleeping) is a tactical one. As to a juror seeing defendant shackled in jail garb, the issue had, in fact, been addressed by the trial court. A mid-trial minute order states: "In chambers: Court and both counsel and juror in seat (11) are present to address the said juror seeing the defendant in his jail clothing being wheeled through the door leading to the back hallway of the courtroom while he was waiting in an area of the public hallway. After the court inquires, the juror says seeing the defendant in custody will have no bearing on deciding the case and he has not told any of the jurors what he saw. The court admonishes the said juror not to say anything to the other jurors about what he saw." Moreover, defendant testified that he was continuously in custody from the time of his arrest on March 30, 2013; this was part of his defense that he could not have gone to the storage locker after that date. Thus, the juror seeing him in jail garb could not possibly have been prejudicial.

In any event, we agree with the trial court that defendant's *Marsden* motion was nothing more than a defendant disappointed with the result trying to remove the attorney who had failed to get him an acquittal. Defendant failed to establish that continued representation by his counsel would deny him effective assistance, or any conflict except for a disagreement over tactics. Defendant did not expressly state he was pursuing the *Marsden* motion to obtain new counsel for sentencing; rather he sought new counsel to file a new trial motion based on ineffective assistance of his then-current counsel. The trial court, in denying the *Marsden* motion, noted that the evidence against defendant was "[i]nsurmountable." While defendant points to certain things he would have done differently had he remained in control of his defense, we fail to see how any of counsel's perceived shortcomings had any effect on defendant's case, in light of the overwhelming evidence of his guilt.

16

4.      *Prior Prison Term*

Under Penal Code section 667.5, subdivision (b), a defendant's sentence is enhanced by one year for each "prior separate prison term" under certain circumstances. Here, defendant was charged with, and admitted, three prior prison terms. However, it appears that although defendant suffered three prior convictions, he served only two separate prison terms in connection with them. Defendant contends one of the prior prison term enhancements must therefore be stricken. The prosecution concedes the error. We agree, and will modify defendant's sentence accordingly.

5.      *Stay-Away Order*

At sentencing, the trial court, on its own motion, and without citation to any authority, imposed an order that defendant stay at least 100 yards away from victim Fairmon and the location "of the incidents." There does not appear to have been any time limit to the order. Defendant contends the order must be reversed as being without legal basis. We agree.

Under Penal Code section 136.2, a trial court may order a defendant to stay away from a crime victim.[8] Such an order, however, is valid only during the pendency of the action. (*People v. Ponce* (2009) 173 Cal.App.4th 378, 382 (*Ponce*).) There are other statutory provisions for long-term protective orders, but they set forth "numerous procedural protections for persons subject to them." (*Id*. at p. 383.) There is no suggestion that the restraining order in this case complied with any such requirements. An unauthorized restraining order with no statutory basis, which was not imposed as a condition of probation, must be reversed. (*Ibid.*)

The prosecution suggests that, independent of statutory authority, a trial court has inherent authority to issue appropriate protective orders. The same argument was made and rejected, in large part, in *Ponce*. The *Ponce* court warned, "An existing body of statutory law regulates restraining orders. ' "[I]nherent powers should never be exercised in such a manner as to nullify existing legislation . . . ." ' [Citation.] Where the

---

**8**      The order is not issued as a matter of course, but requires good cause. (Pen. Code, § 136.2, subd. (a)(1).)

Legislature authorizes a specific variety of available procedures, the courts should use them and should normally refrain from exercising their inherent powers to invent alternatives. [Citation.] [¶] Moreover, even where a court has inherent authority over an area where the Legislature has not acted, this does not authorize its issuing orders against defendants by fiat or without any valid showing to justify the need for the order. [Citation.]" (*Id.* at p. 384.)

*Ponce* allowed that, in unique and compelling circumstances, such as where the defendant threatened witnesses after having been charged, a court may be justified in exercising its inherent power to enter a protective order. (*Ponce, supra*, 173 Cal.App.4th at pp. 384-385.) There was no such showing in this case. Conceding the absence of a valid showing on the record, the prosecutor speculates that "there might have been discussions off the record" justifying imposition of the order, and therefore asks this court to remand so the parties could make a record as to "the legal and factual basis for the order." First, we may not fashion or approve relief on matters outside the record. Second, if anything, the trial court's statement imposing the order—"I don't know—I am going to include this, that defendant shall be required to stay away from Ms. Fairmon" implies the court acted sua sponte and without certainty as to whether the order was within the court's powers.

Respondent points to two cases, *Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1094-1095, and *People v. Clayburg* (2012) 211 Cal.App.4th 86, 91-92, in support of the lawfulness of the stay-away order. The former deals with orders to not contact jurors. The latter deals with stay-away orders as part of a defendant's conviction of stalking under Penal Code section 656.9. Subdivision (k) of that statute expressly calls for stay-away orders. Neither case has application here.

The Attorney General suggests that we remand the matter to the trial court for further consideration of a stay-away order. We see no basis for a remand to allow the prosecution an opportunity to justify an order it never sought, and for which the record discloses no legal or factual basis.

18

6.      *Designation of Violent Felonies*

We asked the parties to discuss whether the abstract must be modified to indicate three of defendant's offenses were violent felonies. In two of the nine burglaries of which defendant was convicted, it was pleaded and proven that another person, not an accomplice, was present in the residence at the time of the burglary. This finding renders those burglaries violent felonies. (Pen. Code, § 667.5, subd. (c)(21).) Additionally, the carjacking offense is a violent felony, both in and of itself and due to the Penal Code section 12022.53 enhancement. (Pen. Code, § 667.5, subds. (c)(17), (22).) As such, the abstract must be modified to identify these three offenses as violent felonies.

7.      *Presentence Credit*

We also asked the parties to address whether defendant's presentence conduct credits must be reduced, due to his conviction of violent felonies. Penal Code section 2933.1, subdivision (c) provides that the maximum conduct credits to be awarded for a person convicted of a violent felony is 15 percent. As defendant was convicted of three violent felonies, this limitation applies. Defendant had 858 days of actual credit and was awarded 858 days of conduct credits. The conduct credits must be reduced to 128 days.

## DISPOSITION

The judgment is modified to: (1) strike the imposition of one of the three Penal Code section 667.5, subdivision (b) prior prison term enhancements; (2) strike the imposition of the stay-away order; and (3) reduce defendant's presentence conduct credits from 858 days to 128 days. Additionally, the superior court is directed to modify the abstract of judgment to reflect that counts 1, 8, and 11 are violent felonies. The superior court shall forward a copy of the amended abstract to the Department of Corrections. As modified, the judgment is affirmed.


                                        RUBIN, J.

WE CONCUR:

          BIGELOW, P. J.                                        GRIMES, J.


19